[Cite as *State v. Armstrong*, 2016-Ohio-5263.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2015-CA-31 |
| | : | |
| v. | : | T.C. NO. 15CR111 |
| | : | |
| DAVID M. ARMSTRONG | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 5th day of August, 2016.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, 200 N. Main Street, Urbana, Ohio 43078
        Attorney for Plaintiff-Appellee

ANDREW R. PRATT, Atty. Reg. No. 0063764, 18 East Water Street, Troy, Ohio 45373
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} David M. Armstrong appeals from a judgment of the Champaign County Court of Common Pleas, which found him guilty on his guilty pleas of two counts of

"attempted felonious assault" (including one with a one-year firearm specification) and one count of aggravated possession of drugs. He challenges his sentence on appeal. For the following reasons, the judgment of the trial court will be affirmed.

## I. Procedural History

{¶ 2} On January 9, 2015, Armstrong pled guilty to one count of attempted felonious assault, with a one-year firearm specification (Count I, a felony of the third degree), one count of attempted felonious assault, without a firearm specification (Count II, a felony of the third degree), and one count of aggravated possession of drugs (Count III, a felony of the fifth degree).[1] A presentence investigation report was prepared, and Armstrong filed a sentencing memorandum, to which he attached a forensic psychological evaluation and other exhibits.

{¶ 3} On August 3, 2015, the trial court sentenced Armstrong to prison as follows: 1) 24 months on Count I, with an additional mandatory 12 months on the firearm specification, 2) 24 months on Count II, and 3) 12 months on Count III, all to be served consecutively. The court also imposed a three-year term of post-release control, ordered him to pay court costs and restitution, and noted that, as part of the plea agreement, Armstrong had agreed to forfeit certain property (firearms, ammunition, and firearms' equipment) to the sheriff's office.

{¶ 4} Armstrong appeals from the trial court's sentence, arguing that the trial court erred in imposing the maximum prison term on Count III and in ordering that his sentences

---

[1] The attempt offenses were charged under R.C. 2923.02, which defines an "attempt," and R.C. 2903.11(A)(1) (felonious assault, causing serious physical harm to another), rather than under R.C. 2903.11(A)(2), which defines felonious assault to include an attempt.

be served consecutively.

## II.     Facts of the Offense and Information Relevant to Sentencing

{¶ 5}  According to the presentence investigation, on the afternoon of May 15, 2015, sheriff's deputies were dispatched to Armstrong's residence on State Route 29 in Champaign County on reports of shots being fired at vehicles and objects being thrown into the roadway.   Specifically, a 911 caller had been driving by in a car with her young grandson when shots were fired at their car; there was a bullet hole above the rear passenger-side brake light of the car, but neither of the occupants had been struck.   Two motorists in another vehicle also reported hearing "a slapping noise on the outside" of their vehicle several times as they passed Armstrong's residence, and they realized a short time later that there was damage to the vehicle.

{¶ 6}  Sheriff's deputies issued a "CODERED alert" to nearby residents advising them to remain in their residences, and the deputies shut down a portion of State Route 29.   Deputies also stopped a woman (presumably a neighbor) who was walking along State Route 29; she had been walking toward Armstrong's house because she heard a hissing noise that she believed to be a propane tank leak.   Deputies later observed a bullet hole in the propane tank behind Armstrong's residence, from which "was leaking a large amount of propane."

{¶ 7}  Some deputies formed a perimeter around Armstrong's property, while others approached his residence in an unmarked patrol vehicle.   By that time, Armstrong had walked toward and sat inside a motor vehicle parked by a barn behind the residence; he had not seemed to be carrying anything in his hands.   Armstrong was ordered out of the vehicle and taken into custody without further incident.   He stated that he had been

in the Army, admitted that he had been drinking the day of the incident, and stated that he was "paranoid."

{¶ 8} When Armstrong was patted down, a small metal box holding a glass pipe and a clear bag containing a green substance were found in his pocket; the green substance was later found to be "Spice," a synthetic cannabinoid. An "AR-15 style rifle" was found at the bottom of a stairwell near the back door of Armstrong's residence, and many other firearms and several hundred rounds of ammunition were found throughout the house. Gunshot residue was found on Armstrong's hands.

{¶ 9} According to Armstrong's version of the events, he was paranoid, mad, stressed, overwhelmed, and scared at the time of the incident and had been for a long time. He stated that he only intended to shoot bottles when he went outside with his weapon; he then decided to shoot the propane tank and to fire "warning shots" for people who he thought were following him.

{¶ 10} Armstrong stated that, earlier in the day, he had "stopped someone following me" and had gone to his father's house. He then went to a "crick" "to kinda breathe, but there were cars driving by every thirty seconds," which aggravated his paranoia. When Armstrong was driving with his father to get some food, his father stated that they "needed to get help," whereupon Armstrong jumped out of the truck and ran into the woods, then went home. It was after this encounter that he started shooting beer bottles and the propane tank at his house. Because people were driving by and he thought they were following him, he "started shooting vehicles behind the passenger compartments." He stated that he was trying to get the vehicles to stop driving by and did not intend to hurt anyone. Armstrong also "broke out [his] upstairs window and shot

some more." Armstrong stated that he had had similar concerns about being followed when he was stationed at Fort Hood in the Army. He admitted that he had not considered the "results" of his actions ahead of time, but stated that he was glad that no one was hurt.

{¶ 11} Armstrong reported that he had been discharged from the military in 2007 after suffering some mental health problems. He claimed that he had been getting outpatient treatment at the Veterans Administration (VA) in Springfield for six months and that "he would only do mental health treatment at the VA." He stated, however, that the VA attributed his issues to alcohol use. He reported being diagnosed with paranoid schizophrenia while in the Army, but stated that it was described as a "personality disorder * * * on his release to prevent hospitalization and to get an honorable discharge." He stated that his military and VA records could not be obtained due to a "Congressional inquiry."

### III. Sentencing Considerations

{¶ 12} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King,* 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard,* 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis,* 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 13} R.C. 2929.11 requires trial courts to be guided by the overriding principles

of felony sentencing. Those purposes are "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). The court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

**{¶ 14}** R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense. These factors include whether the physical or mental injury to the victim was exacerbated because of the physical or mental condition of the victim; serious physical, psychological, or economic harm suffered by the victim as a result of the offense; whether the offender's relationship with the victim facilitated the offense; and whether the offender committed the offense for hire or as a part of an organized criminal activity.

**{¶ 15}** R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense, including whether the victim induced or facilitated the offense, whether the offender acted under strong provocation, whether, in committing the offense, the offender did not cause or expect to cause physical harm to any person or property, and the existence of substantial grounds to mitigate the

offender's conduct, although the grounds are not enough to constitute a defense. R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record.

{¶ 16} In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the

offender.

**{¶ 17}** In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, Ohio Sup.Ct. Slip Opinion No. 2016-Ohio-1002, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

**{¶ 18}** Among the factors found by the trial court to be more serious than conduct normally constituting the offense, the court observed that Armstrong used a firearm in the commission of the attempted felonious assaults and that, in addition to the harm which could have flowed from striking a person directly, the shootings could have caused collisions on the roadway or, by shooting at the rear of vehicles, caused the cars to "implode." The court also found that, by shooting at a propane tank, Armstrong posed a serious risk to law enforcement officers who responded to the scene. The trial court further noted that the woman whose car was struck "suffered serious physical, psychological, or economic harm" as a result of the offense. The court cited Armstrong's use of alcohol prior to the offense as a contributing factor.

**{¶ 19}** Among the factors found by the trial court to be less serious than conduct normally constituting the offense, the court found "substantial grounds to mitigate the Defendant's conduct," including a "very significant psychological disturbance," some evidence of an "effort by [Armstrong] not to cause physical injury," and a lack of intent to cause physical injury.

{¶ 20} With respect to recidivism, the court expressed concern that Armstrong vacillated about whether he needed professional help and noted that his mental illness "has gone largely untreated and has evolved to an increased risk for decompensation of thought process with irrational and paranoid ideation predominating." On the other hand, the court recognized Armstrong's lack of a criminal record and the psychologist's findings that Armstrong's prospect for recovery could be good "with appropriate psychotherapy and psychotropic medication." The court concluded that the risk of recidivism was high, that, according to the psychologist, treatment would be "long-term and arduous," and that the court was not aware of a residential treatment facility that could address Armstrong's severe mental health issues.

{¶ 21} Finally, the court acknowledged Armstrong's record of military service and that his mental condition, which contributed to the offenses with which he was charged, was "traceable" to that service.

{¶ 22} In imposing the maximum sentence for aggravated possession of drugs, the court reasoned that, "in the Court's view, the Defendant's use of drugs to self-medicate allow[ed] the Defendant's mental health issues to evolve into a state of severe psychopathology." The court found that consecutive sentences were appropriate because of the seriousness of Armstrong's conduct, the dangers it had posed, that multiple offenses were committed as part of a course of conduct, and that the harm caused was so great or unusual that no single prison term for any of the offenses adequately reflected the seriousness of the conduct.

### IV.    Maximum Sentence for Aggravated Possession of Drugs

{¶ 23} Armstrong argues that the trial court's reasons for imposing a maximum sentence for aggravated possession of drugs were unsupported by the record. (The trial court did not impose the maximum sentence on the other counts.) Armstrong points out that these were his first offenses and that there were no drugs, including cannabinoids, in his system at the time of the offenses. He also notes that possession of a synthetic cannabinoid is a felony of the fifth degree, which carries a presumption of community control sanctions, whereas he was sentenced to 12 months of imprisonment.

{¶ 24} Before we address Armstrong's specific arguments, we will address more generally his assertion that the "presumption" of community control sanctions set forth in R.C. 2929.13(B) applied in this case.

{¶ 25} R.C. 2929.13(B) provides that an offender who is convicted of or pleads guilty to a felony of the fourth or fifth degree that is not an offense of violence or that is a "qualifying assault offense" shall be sentenced to a community control sanction, subject to certain exceptions and conditions. (Some courts refer to R.C. 2929.13(B)(1)(a) as creating a "presumption" of community control, whereas others view community control as "mandatory," subject to certain conditions and exceptions.) One of the required circumstances to invoke the "presumption" of a community control sentence is that "[t]he most serious charge against the offender at the time of sentencing is a felony of the fourth or fifth degree." R.C. 2929.13(B)(1)(a)(ii). Because the two counts of attempted felonious assault to which Armstrong pled guilty were felonies of the third degree, the presumption of community control set forth in R.C. 2929.13(B)(1)(a) did not apply to the drug offense.

{¶ 26} Furthermore, R.C. 2929.13(B)(1)(b) provides that the trial court "has discretion to impose a prison term upon an offender who is convicted of or pleads guilty to a felony of the fourth or fifth degree that is not an offense of violence or that is a qualifying assault offense" if any of certain conditions apply. These conditions include that the "offender committed the offense while having a firearm on or about the offender's person or under the offender's control" (R.C. 2929.13(B)(1)(b)(i)) and "[i]n committing the offense, the offender attempted to cause or made an actual threat of physical harm to a person with a deadly weapon" (R.C. 2929.13(B)(1)(B)(vi)). Given the nature of Armstrong's offenses, i.e., shooting a firearm at occupied vehicles, it would also appear that he trial court had discretion to impose a prison sentence under R.C. 2929.13(B)(1)(b).

{¶ 27} Armstrong makes three specific arguments in asserting that a maximum prison sentence was not appropriate for his drug offense: 1) he asserts that he did not have drugs in his system at the time of the offenses in question, 2) he did not have drugs on his person, and 3) the trial court "exaggerated" the psychologist's conclusions with respect to the effect of drugs on his condition.

{¶ 28} With respect to the first argument, we note that the trial court did not specifically comment on the presence or absence of drugs in Armstrong's system at the time of the offenses. (The court's observations with respect to this use of alcohol and drugs, generally, will be discussed below.) We also note that Armstrong relies on an ARUP Laboratories report, attached to his sentencing memorandum, in claiming that no drugs, including cannabinoids, were in his system at the time of the offenses. However, the report states that the "Collection Date" of the sample was May 18, 2015. The date

of the offenses was May 15, 2015, and the report does not address the length of time that any of the tested-for substances might be expected to remain in one's system. We cannot conclude that this document, standing alone, established the absence of the tested-for drugs in Armstrong's system on May 15, 2015. Accordingly, even if we were to assume that the trial court should have considered the report, we could not conclude that the trial court erred in giving little, if any, weight to this alleged fact.

{¶ 29} There is no evidence in the record to support Armstrong's second assertion: that the synthetic cannabinoids were found in his house rather than on his person. This issue was not addressed at the plea hearing, and the presentence investigation states that the substance was found "in his pocket" during a pat-down search.

{¶ 30} Finally, Armstrong argues that the psychologist who evaluated him (and whose report was attached to his sentencing memorandum) "noted that the use of alcohol and drugs exacerbates [his mental health] problems, but not to the exaggerated extent noted by the Trial Court."

{¶ 31} The psychologist's report repeatedly referenced Armstrong's "chronic substance abuse" contributing to his impulse control problems and failure to consider alternate courses of action, his "alcohol use disorder and cannabis use disorder," the "very high risk" that a person with paranoid personality disorder (like Armstrong) will become "over-involved in alcohol and other substance abuse disorders," Armstrong's need for substance abuse counseling, and his "need to achiev[e] abstinence from alcohol and cannabis use." The psychological report also stated that Armstrong "was unable to follow a path of recovery following his discharge from the United States Army and,

consequently, his psychological condition remained quite tenuous if not deteriorating. More specifically, he continued to experience the stress of depression and anxiety, agitation, high threat sensitivity and vulnerability, suspiciousness and mistrust of his environment, brief episodes of psychotic activity involving loosening of reality ties, and excessive involvement in alcohol and cannabis abuse."

{¶ 32}  As Armstrong points out, the court did state at the sentencing hearing that it was imposing the maximum sentence on Count III because "the Defendant's use of drugs to self-medicate allow[ed] the Defendant's mental health issues to evolve into a state of severe psychopathology."  However, the court stated that this was its view, and did not suggest that the psychologist drew this connection.  Moreover, there is no dispute that Armstrong had consumed alcohol prior to the offense, which occurred around noon, and that the trial court found this to be a factor in finding the offense "more serious" than other similar offenses.

{¶ 33}  The presentence investigation and psychological report, as well as other accounts of the events that transpired, are replete with evidence that Armstrong's drug and alcohol use exacerbated his mental health issues.  The trial court could have reasonably concluded – even without the psychologist's opinions -- that Armstrong's substance abuse, as well as his well-documented fluctuations (as discussed in the PSI and the psychologist's report) between recognizing and denying his need for professional help for his mental health and substance abuse issues, played a role in his deteriorating condition and criminal activity.

{¶ 34}  Armstrong cites numerous cases from Champaign and other counties in which offenders convicted of possession of marijuana, including some with criminal

records, were sentenced to community control sanctions or to a prison sentence of less than one year. He argues that his sentence was inconsistent or disproportionate with the sentences imposed in these similar cases.

{¶ 35} Consistency includes a range of sentences, taking into consideration a trial court's discretion to weigh the relevant statutory factors; even if offenses are similar, distinguishing factors may justify dissimilar sentences. *State v. Terrel*, 2d Dist. Miami No. 2014-CA-24, 2015-Ohio-4201, ¶ 16, citing *State v. Murphy,* 10th Dist. Franklin No. 12AP-952, 2013-Ohio-5599, ¶ 14, and *State v. Battle,* 10th Dist. Franklin No. 06AP-863, 2007-Ohio-1845, ¶ 24. Additionally, consistency in sentencing does not result from a case-by-case comparison, but by the trial court's proper application of the statutory sentencing guidelines. *Id.*, citing *State v. Hall,* 179 Ohio App.3d 727, 2008-Ohio-6228, 903 N.E.2d 676, ¶ 10 (10th Dist.). An offender cannot simply present other cases in which an individual convicted of the same offense received a lesser sentence to demonstrate that his sentence is inconsistent with other sentences; rather, to demonstrate that a sentence is inconsistent, an offender must show that the trial court did not properly consider applicable sentencing criteria found in R.C. 2929.11 and 2929.12. *Id.*; *Battle* at ¶ 21-23.

{¶ 36} The trial court conducted a thorough analysis of the sentencing factors. It focused, in particular, on the great potential for harm inherent in Armstrong's conduct, although, luckily, no physical injuries were inflicted. In addition to the obvious danger posed by gunfire toward moving, occupied vehicles, the prosecutor observed that the propane tank that Armstrong shot could have exploded, and that the gas in the air caused substantial danger as officers and fire department personnel approached the scene.

"Law enforcement had concerns about whether they would even be able to use their weapons to defend themselves as they approached Defendant because of the smell of propane in the air [and] the fear that firing their weapons in self defense may cause or trigger some sort of explosion."

{¶ 37} The court recognized that Armstrong's military service had contributed to the offenses and expressed compassion and concern about Armstrong's mental health, while recognizing that treatment options were limited. As best we can discern from the record, the trial court faced a no-win choice between treatment without assured safety for the community and safety for the community without assured treatment.

{¶ 38} Considering the interplay between Armstrong's mental health issues, his substance abuse, the effect of his substance abuse in aggravating his mental health issues, and the substantial danger posed by his actions in this case, we cannot clearly and convincingly conclude that the trial court's imposition of the maximum sentence for Armstrong's aggravated possession of drugs was unsupported by the record or contrary to law.

{¶ 39} The first assignment of error is overruled.

## V. Imposition of Consecutive Sentences

{¶ 40} In his second assignment of error, Armstrong argues that the trial court erred by imposing consecutive sentences, given that he was a first-time offender who caused no physical harm, was remorseful, and "accepts the need for treatment." Again, Armstrong cites other cases from this district in support of his position, observing that we have, in other cases, reversed maximum, consecutive sentences imposed on first-offenders.

**{¶ 41}** As discussed above, in order to impose consecutive sentences pursuant to R.C. 2929.14(C)(4), a trial court is required to make at least three distinct findings: (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the subsections (a), (b), or (c) applies, related to whether multiple offenses were committed, the circumstances surrounding those offenses, and the harm caused thereby. The trial court must make the statutory findings and incorporate them into its sentencing entry, but it is not required to state reasons to support its findings. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. As with the imposition of a maximum sentence, an appellate court may modify or vacate a consecutive sentence only if it clearly and convincingly finds that the record does not support the sentencing court's findings. R.C. 2953.08(G)(2); *Marcum*, Ohio Sup.Ct. Slip Opinion No. 2016-Ohio-1002, ¶ 22.

**{¶ 42}** First, as discussed with regard to the imposition of maximum sentences, above, we disagree with Armstrong's premise that sentences imposed in different cases can be compared based on the similarity of one or two facts, such as the status of the defendant as a first-offender or the crime charged. Many factors enter into a sentencing determination in each case, and sentences cannot reasonably be compared to one another in this manner. *See Terrel*, 2d Dist. Miami No. 2014-CA-24, 2015-Ohio-4201, ¶ 16; *Battle*, 10th Dist. Franklin No. 06AP-863, 2007-Ohio-1845, ¶ 24.

**{¶ 43}** Armstrong also asserts that he "was not the worst offender and his conduct

was far from the worst," and that his service to his country and need for rehabilitation should have been given greater weight. We cannot clearly and convincingly find that the trial court's conclusion that Armstrong's actions were the worst form of the offense of *attempted* felonious assault was not supported by the record. The fact that the offenses were charged as attempts reflects the fact that no one suffered physical injury; nonetheless, Armstrong's conduct disregarded the *potential* for injury to a great many people. The trial court's conclusions that consecutive sentences were not inconsistent with the seriousness of Armstrong's conduct and to the danger it posed and that "no single prison term * * * adequately reflects [its] seriousness" were not clearly and convincingly unsupported by the record.

{¶ 44} Finally, Armstrong contends that the trial court improperly elicited the prosecutor's opinions on matters about which he "was clearly not qualified to opine" during the sentencing hearing, specifically Armstrong's ability to aim at a moving vehicle without aiming for its occupants.

{¶ 45} The trial court did inquire of the prosecutor whether the State believed that Armstrong "was capable of selecting his outcome," in other words, whether he "just haphazardly shot" and happened to hit the back of the vehicle in which a woman and her grandchild were driving, or whether he was able to intentionally shoot only at the back of the vehicle. In response, the prosecutor acknowledged his limited qualifications to answer the question, but observed that Armstrong had shot at cars "being driven by humans," that "[t]his isn't the movies," and the cars were being driven at high rates of speed; "as a layperson, I find it difficult to believe that he had the skill set, such a high skill set, that he could choose precisely how he was going to strike that car with his shot

from the rifle.   And that he was going to do it in such a way that nobody would be hurt." (We note that defense counsel was similarly permitted to offer non-expert observations about his experience with mentally ill persons and to suggest, through Armstrong's statements, that Armstrong had the expertise to fire at a moving car without intending to hit the people inside.)

{¶ 46}  One of the factors the court found was that Armstrong did not intend to cause physical injury.  It is reasonable to assume that the trial court understood the prosecutor's statements to reflect the State's theory of the case, not expert testimony about firearms and Armstrong's marksmanship.

{¶ 47}  The trial court found, with respect to the imposition of consecutive sentences, that such sentences were necessary to protect the public from future crime, were not disproportionate to the seriousness of Armstrong's conduct and the danger he posed to the public, that at least two of the offenses were committed as part of one or more courses of conduct, and that the harm caused by the multiple offense was so great or unusual that a single prison term did not adequately reflect its seriousness.  We cannot clearly and convincingly find that the record does not support these findings or that the imposition of consecutive sentences was contrary to law.   .

{¶ 48} The second assignment of error is overruled.

## VI.    Conclusion

{¶ 49}  The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, P.J., dissenting:

**{¶ 50}** I respectfully dissent. Missing from the trial court's analysis is consideration that Am.Sub.H.B. 86 created a statutory presumption in favor of concurrent sentences to punish an offender like Armstrong. As I have previously noted, the "trial court must give serious consideration to the departure from concurrent terms and not utilize consecutive terms as the presumptive starting point." *State v. Withrow*, 2d Dist. Clark No. 2015-CA-24, 2016-Ohio-2884, ¶ 54 (Donovan, P.J. dissenting). I note that while Armstrong acknowledged that he had a prior OVI offense, the court indicated that it did not "find the OVI to be a criminal offense. And prior to committing the offense the Defendant has led a law-abiding life for a significant number of years." Significantly, the court further indicated that "there was some effort by the Defendant not to cause physical injury to another person," and the court "adopt[ed] Defense Counsel's position that the Defendant * * * did not intend to physically assault the motorists."

**{¶ 51}** R.C. 2929.12(F) addresses the issue of the mitigating weight to assign to the effects of military service for veterans and provides: "The sentencing court shall consider the offender's military service record and whether the offender has an emotional, mental, or physical condition that is traceable to the offender's service in the armed forces of the United States and that was a contributing factor in the offender's commission of the offense or offenses." At sentencing, the court indicated that it considered Armstrong's military service record and determined that he "has a mental condition that is traceable to the Defendant's service in the Armed Forces. And that the Defendant's service in the Armed Forces was a contributing factor to the Defendant's commission of [the] offense or

offenses."

**{¶ 52}** In *State v. Belew*, 140 Ohio St.3d 221, 2014-Ohio-2964, 17 N.E.3d 515, Justice Lanzinger dissented from the majority opinion dismissing the matter "as having been improvidently accepted," finding that the Court instead "should render an opinion on how [PTSD] must be considered by a court when it sentences a military veteran. And just as important, we should clarify the standard that an appellate court must use in reviewing a sentence of this type."  *Id.*, ¶ 3.  Justice Lanzinger noted that R.C. 2929.12(F) "is a stand-alone provision and was not placed under subsection (D) (factors indicating that the offender is likely to commit future crime) or subsection (E) (factors indicating that the offender is not likely to commit future crimes)."  *Id.*, ¶ 21.

**{¶ 53}** It is well known that veterans such as Armstrong often suffer from PTSD, mental illness, and substance abuse problems that were caused by their experiences in the military.  In addressing veterans at the kickoff event for the Montgomery County veterans' treatment court in 2013, Justice Eveylyn Lundberg Stratton stated, "You defended our country, * * * Sometimes you ended up with these problems - not because you had a bad personality or you made a mistake - but because you served our county and came back with war wounds most of which we cannot see." Http://www.vorys.com/newsevents-news-736.html.[2]

**{¶ 54}** Armstrong's version of events as reflected in his PSI makes clear that he was experiencing psychological problems and paranoia at the time of the offenses as follows:

---

[2] Apropos to paragraphs 52 and 53, I'd urge the Ohio Supreme Court to address the impact of PTSD on sentencing decisions for military veterans and review Armstrong's case.

　　　　* * * I knew not the harshness of judgment for my actions, nor did I consider results for my actions before hand. I was perinoid (sic), mad, stressed, and [had] been for a great length of time. No one really cared (so I thought) at the moment. I did not go outside with wepeon (sic) with intent to do anything other than shoot bottles. Then I decided to shoot propane tank - then - warning shoots for ppl. I thought were following me. Then house and window - etc. (no plan[n]ing) was just mad and at the moment I was upset about were (sic) I was in my life feeling overwhelmed/scared. Perinoid pissed off and wanted to change things with myself; job, etc. Didn't think about actions but now glad that no one is hurt, otherwise idk[3] if I would have been able to live with my actions - so on that note I realize there are consiquence (sic) to my actions and for that I have no excuses or justified reason.

**{¶ 55}** Armstrong's Forensic Psychological Evaluation concluded that he "has been experiencing and continues to manifest multiple psychological problems which are in the range of moderate to severe psychopathology." According to the report, Armstrong is "in need of a multi-modal treatment program involving psychiatric counseling, psychotherapeutic interventions specifically related to posttraumatic stress disorder preferably in a Veterans Administration Hospital which is more experienced in working with returning soldiers who have this disorder, and psychotherapeutic treatment

---

[3] This author believes "idk" is an acronym commonly used in text messaging that means "I don't know."

oriented towards assisting Mr. Armstrong to gain relief from his paranoid mentation and to achieve significant cognitive restructuring wherein he might begin to establish trust with others and a greater sense of safety and security in his world."

**{¶ 56}** In light of the court's conclusion that Armstrong did not intend to harm anyone, and the fact that no one was physically injured, as well as Armstrong's ongoing struggle with PTSD and substance abuse problems traceable to his service, I believe the trial court erred by imposing a consecutive term of imprisonment which clearly and convincingly lacks support in the record. Although surely culpable, Armstrong has been failed by the Department of Veterans Affairs and the criminal justice system. I do not reach this conclusion lightly knowing one victim indicated she suffered serious psychological injury, while the other victim did not provide a victim impact statement revealing a psychological injury. In my view, the psychological impact on one victim does not dictate a consecutive term. Fortunately, no physical injury occurred and the propane tank did not explode. Since Armstrong's PTSD is traceable to his military service and contributed to the commission of his offenses, I believe that his PTSD and related conditions mitigate in favor of a concurrent term of imprisonment, and I accordingly would reverse and vacate the sentence and order the trial court to impose a concurrent term of imprisonment consistent with the statutory presumption.

. . . . . . . . . .

Copies mailed to:

Jane A. Napier
Andrew R. Pratt
Hon. Nick A. Selvaggio