[Cite as *State v. Kimbrough*, 2020-Ohio-3175.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                                 Nos. 108172 and 108173

    v.                            :

TERRANCE KIMBROUGH,               :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** June 4, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-18-628578-A and CR-18-628608-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Yasmine M. Hasan and John Kirkland, Assistant Prosecuting Attorneys, *for appellee.*

Timothy F. Sweeney, *for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} In these consolidated criminal appeals, defendant-appellant Terrance Kimbrough ("Kimbrough"), who was fifteen years old at the time of the incidents underlying the charges, challenges the decision of the Cuyahoga County Common Pleas, Juvenile Court Division, to transfer his cases to the adult criminal

division for adjudication, and the adult court's imposition of a seven-year prison sentence. We affirm the trial court's judgment but remand for nunc pro tunc entries to document the imposition of concurrent sentences in the two cases.

## I. Background and Facts

### A. Collinwood Case

{¶ 2} A complaint was issued against Kimbrough by the juvenile court in J.C. No. DL-17119224 (Cuyahoga C.P. No. CR-18-628578) (hereinafter "Collinwood") on the following counts arising from the December 11, 2017 robbery and assault of the pastor, Father John Kumse ("Father Kumse") of St. Mary's Parish in Cleveland's Collinwood neighborhood:

Count 1 — Aggravated robbery, R.C. 2911.01(A)(1), first-degree-felony;

Count 2 — Felonious assault, R.C. 2903.11(A)(1), a second-degree felony;

Count 3 — Receiving stolen property, R.C. 2913.51(A), a fourth-degree felony;

Count 4 — Tampering with evidence, R.C. 2921.12(A)(1), a fourth-degree felony; and

Count 5 — Tampering with evidence, R.C. 2921.12(A)(1), a fourth-degree felony.

The first three counts carried one- and three-year firearm specifications and a weapon forfeiture. Charges were also filed against Kimbrough's accomplices: J.M.,

M.M., T.P., and A.W.[1]  Boundover with Kimbrough, J.M. and A.W. subsequently entered into plea agreements.

## B.    Detention Center Case

{¶ 3}    In Cuyahoga C.P. Case No. CR-18-628608 (J.C. No. DL-18100785), during his detention at the Juvenile Justice Center ("Detention Center") for the Collinwood case,  Kimbrough was charged with eight additional counts arising from his alleged involvement in the January 8, 2018 uprising in the incarceration pod along with D.H., E.B., D.W., T.M.A., and A.R.T. who were not involved in the Collinwood case:

Count 1 — Escape, R.C. 2921.34(A)(1), a felony of the second-degree;

Counts 2 and 3 — Inciting to violence, in violation of R.C. 2917.01(A)(1) and (A)(2), felonies of the third-degree;

Counts 4 and 5 —  Aggravated riot, in violation of R.C. 2917.02(B)(2) and (A)(2), felonies of the third and fourth degrees, respectively;

Count 6 — Vandalism, in violation of R.C. 2909.05 (B)(2), a felony of the fourth degree;

Count 7 — Possessing criminal tools, in violation of R.C. 2923.24(A), a felony of the fifth degree; and

Count 8 — Disorderly conduct, in violation of R.C. 2917.11(A)(5), a misdemeanor of the fourth-degree misdemeanor.

---

[1]  A.W. is sometimes referred in the record to by the nickname "A.J.," but is identified as A.W. herein for purposes of consistency.  T.P. is also erroneously identified in some portions of the record as "T.T." but is consistently identified herein as T.P.

## C. Probable Cause and Amenability

{¶ 4} On December 28, 2017, and January 25, 2018, respectively, pursuant to Juv.R. 30 and R.C. 2152.10(B), the state moved the juvenile court to relinquish jurisdiction for adult criminal prosecution in the Collinwood and Detention Center cases.

{¶ 5} The probable cause hearing in the Collinwood case was held on March 13, 2018, for Kimbrough, J.M., and A.W. The state presented four witnesses and multiple exhibits. The Detention Center probable cause case was held on March 16, 2018. The state presented five witnesses and multiple exhibits. No evidence was presented by the defense in either hearing.

{¶ 6} The trial court found probable cause lacking for Count 5, the fourth-degree felony aggravated rioting charge under R.C. 2917.02(A)(2), in the Detention Center case. The trial court determined that probable cause existed that Kimbrough committed or was complicit in the remaining counts and that those acts constituted criminal offenses if committed by an adult.

{¶ 7} The amenability hearings were held on May 4, 2018, after the mandatory psychological evaluation. Father Kumse, Detective Kevin Warnock ("Det. Warnock") of the Cleveland Police Department, Terrance Jenkins ("Jenkins"), acting Director of Detention Services for the Juvenile Detention Center, and Sergeant Thomas Bradley of the Sheriff's Department testified. Videos of the incidents and photographs of the damages were admitted. No witnesses were presented by the defense. The trial court concluded that Kimbrough was not

amenable to rehabilitation in the juvenile justice system and relinquished jurisdiction in both cases.

### D. Adult General Criminal Division

{¶ 8} On May 14, 2018, the following eight of the total fifteen-count Collinwood indictments were handed down against Kimbrough:

Count 1 — Attempted murder, alleged violation of R.C. 2903.02(A)/ 2923.02, a felony of the first-degree;

Count 2 — Felonious assault in alleged violation of R.C. 2903.11(A)(2), a felony of the second-degree;

Counts 3 and 4 — Aggravated robbery in alleged violation of R.C. 2911.01(A)(1) and (A)(3), felonies of the first-degree;

Count 5 — Kidnapping in alleged violation of R.C. 2905.01(B)(2), a felony of the first-degree;

Count 6 — Receiving stolen property, in violation of R.C. 2913.51(A), a felony of the fourth-degree;

Count 7 — Carrying a concealed weapon (F-4); and

Count 8 — Improperly handling a firearm in a motor vehicle (F-4).

Cuyahoga C.P. No. CR-628608-A. The remaining counts were charged against co-delinquents J.M., A.W., and K.R. (Cuyahoga C.P. Nos. CR-628608-B, C, and D).

{¶ 9} Counts 1- 5 included one- and three-year firearm specifications, two weapons-forfeiture specifications, and a criminal-gang-activity specification. According to Kimbrough, only Counts 2, 3, and 6 were the subject of the juvenile court proceedings. Also, on May 14, 2018, in Cuyahoga C.P. No. CR-18-628578, Kimbrough was indicted, as the sole defendant for the same eight counts that were contained in the juvenile court Detention Center complaint.

{¶ 10} After discovery concluded, on December 6, 2018, Kimbrough entered into plea agreements in both cases. In the Collinwood case, the then 16-year-old Kimbrough pleaded guilty to:

> Count 2 — Felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second-degree;
>
> Count 3 — Aggravated robbery in violation of R.C. 2911.01(A)(1), a felony of the first-degree; and
>
> Count 6 — Receiving stolen property, in violation of R.C. 2913.51(A), a felony of the fourth-degree.

Counts 2 and 3 included one-year firearm and two weapons forfeiture specifications. All remaining counts and specifications, including gang activity, were nolled.

{¶ 11} In the Detention Center case, Kimbrough pleaded guilty to:

> Count 1 — Escape, R.C. 2921.34(A)(1), a felony of the second-degree;
>
> Count 4 — Aggravated riot, in violation of R.C. 2917.02(B)(2), a felony of the third-degree; and
>
> Count 6 — Vandalism, in violation of R.C. 2909.05 (B)(2), a felony of the fourth-degree.

{¶ 12} In addition, the state explained:

> For purposes of the record, the State has indicated to defense counsel that it would not oppose concurrent sentences in these two cases, Your Honor. There has been no actual plea as to an agreed term of any length, but the State is not going to oppose concurrent sentences if that's the Court's pleasure.

(Tr. 9.)

{¶ 13} Kimbrough was sentenced on January 9, 2019. In the Collinwood case, Count 2 felonious assault and Count 3 aggravated robbery merged as allied offenses. Sentencing proceeded on Count 3 for a term of six years on the base charge

plus the one-year firearm specification, an 18-month concurrent term on Count 6, five years of mandatory postrelease control and forfeiture of the handgun.

{¶ 14} Kimbrough was sentenced in the Detention Center case to two years on Count 1 escape, 12 months on Count 4 aggravated riot, and nine months on Count 6 vandalism, to run concurrent with each other and with the seven-year sentence in the Collinwood case. The trial court also advised Kimbrough that the three years of mandatory postrelease control is overridden by the five years in the Collinwood case so that the five-year mandatory postrelease control applied.

{¶ 15} Court costs were imposed in both cases but no fines. Kimbrough received jail-time credit in both cases for time served up and through the date of his transfer. Each sentencing entry provides that Kimbrough received jail-time credit for 365 days. However, we note that neither trial court journal entry states that the sentences in each case run concurrent to one another, but the record reflects that they are concurrent sentences. (Tr. 65.) The trial court shall issue a nunc pro tunc entry to reflect that the sentences are concurrent. "The function of a nunc pro tunc is not to change, modify, or correct erroneous judgments, but merely to have the record speak the truth." *State v. Kimmie*, 8th Dist. Cuyahoga No. 98979, 2013-Ohio-2906, ¶ 20, citing *Ruby v. Wolf*, 39 Ohio App. 144, 147, 177 N.E. 240 (8th Dist.1931); *Dentsply Internatl., Inc. v. Kostas*, 26 Ohio App.3d 116, 118, 498 N.E.2d 1079 (8th Dist.1985).

{¶ 16} The cases have been consolidated for appeal.

## II.    Assignments of Error

{¶ 17}    Kimbrough assigns as error:

I.    The Cuyahoga County Juvenile Court violated Kimbrough's right to due process of law, because that court's probable cause determination was not supported by sufficient, reliable, and credible evidence, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution.

II.    The juvenile court abused its discretion and violated 15-year-old Terrance Kimbrough's right to due process of law when it determined that he was not amenable to treatment in the juvenile system, in violation of R.C. 2152.12(B);  Fifth and Fourteenth Amendments to the U.S. Constitution, and Article I, Sections 10 and l6, Ohio Constitution.

   A.    The juvenile court cannot fail to consider available treatment options in the juvenile system merely because the youth was involved in the immature acts of destroying and/or defacing Detention Center property.

   B.    The juvenile court cannot ignore obvious evidence of immaturity, poor judgment, unformed and/or undeveloped character, and susceptibility to negative influences and peer pressure.

   C.    The juvenile court lost focus on the statute's presumption of retention in the juvenile system and disregarded the professional assessment that numerous factors suggested Kimbrough was amenable to treatment.

   D.    The juvenile court never considered the wide array of dispositional options available to it for this young teen.

   E.    The juvenile court did not consider how Kimbrough would fare in adult prison.

III.    The sentence imposed in the adult court is contrary to law and/or not supported by the record, thereby requiring this Court to take action under *State v. Jones,* 2018-Ohio-498 (8th Dist. App. 2018) (en banc) and R.C. 2953.08.

### III. Probable Cause

#### A. Standard of Review

{¶ 18} Kimbrough argues that the trial court's probable cause determination was not supported by sufficient, reliable, and credible evidence. Kimbrough was 15 years of age at the time the crimes were committed.

{¶ 19} R.C. 2152.12(A)(1)(a)(ii) provides:

(a)  After a complaint has been filed alleging that a child is a delinquent child for committing an act that would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult, the juvenile court at a hearing shall transfer the case if either of the following applies: * * *

  (ii)  The child was fourteen or fifteen years of age at the time of the act charged, section 2152.10 of the Revised Code provides that the child is eligible for mandatory transfer, and there is probable cause to believe that the child committed the act charged.

*Id.*

{¶ 20} R.C. 2152.10(B) governs in this case:

(B)  Unless the child is subject to mandatory transfer, if a child is fourteen years of age or older at the time of the act charged and if the child is charged with an act that would be a felony if committed by an adult, the child is eligible *for discretionary transfer* to the appropriate court for criminal prosecution. In determining whether to transfer the child for criminal prosecution, the juvenile court shall follow the procedures in section 2152.12 of the Revised Code. If the court does not transfer the child and if the court adjudicates the child to be a delinquent child for the act charged, the court shall issue an order of disposition in accordance with section 2152.11 of the Revised Code.

(Emphasis added.) *Id.*

{¶ 21} In considering the propriety of the discretionary bindover of a 15-year-old under R.C. 2152.12(B), the juvenile court determines whether the state's evidence credibly supports each element of the offense to find that probable cause exists that the juvenile committed the offense. *In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 31, citing *State v. Iacona*, 93 Ohio St.3d 83, 93, 2001-Ohio-1292, 752 N.E.2d 937:

> Probable cause in this context is not guilt beyond a reasonable doubt; it is evidence that raises more than a suspicion of guilt. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶16. This standard requires the juvenile court to "evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause."

*In re C.G.* at ¶ 31, quoting *Iacona* at 93.

{¶ 22} We apply a dual standard to our review of the juvenile court's determination. On the one hand, we "defer to the court's credibility determinations by reviewing for an abuse of discretion." *Id.* On the other hand, we "conduct a de novo review" of the trial court's legal conclusion that sufficient probable cause existed to "believe that the juvenile committed the charged act." *Id.*, citing *In re A.J.S.* at ¶ 1.

{¶ 23} We are also cognizant that the probable cause standard is not as stringent as that of beyond a reasonable doubt and considers whether the state has demonstrated more than a mere suspicion of guilt when weighed upon any evidence presented by the defense. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 16.

B.    Discussion

### 1. Collinwood Case

{¶ 24} Father Kumse testified at the probable cause hearing for Kimbrough, J.M., and A.W. Father Kumse said that he was walking his dog on the parish campus at approximately 6:00 p.m. on December 11, 2017, when he noticed lights at the parish school. He took care of other tasks and, a couple of hours later, decided to return to the building to turn off the lights and secure other areas. Father Kumse noticed a parked dark-colored minivan and heard several voices but did not investigate.

{¶ 25} Father Kumse saw someone walking quickly down the alleyway near the chicken coop which was not unusual because neighbors used the path as a shortcut. He was walking toward the rectory when two young females ran by him toward the minivan. Two young males emerged from the bushes near the parking lot and told Father Kumse to give them the eggs. Father Kumse froze when he saw that one had a gun. The males stood 10 to 15 feet away from him.

{¶ 26} Father Kumse began to yell and run and heard a shot. He turned to see if the youth were still in pursuit and heard another shot as he lost his balance and fell in the parking lot. He ran, fell again, and turned to see the group running toward the minivan that had pulled up beside the school building. The minivan left.

{¶ 27} Father Kumse concluded that the females must have come from a nearby store. The store owner confirmed that the females had been at the store and recognized one of them as the daughter of an acquaintance. Father Kumse returned

to the rectory and contacted 911. Father Kumse was sure that he only saw one gun but cannot say whether it was real or fake.

{¶ 28} Father Kumse described the parish video surveillance footage recorded by multiple cameras at the premises. He identified the two females that he encountered who were heading toward the store and later running past Father Kumse toward the parking lot. Another clip depicts Father Kumse running and falling. Father Kumse also identified the bushes that the males emerged from, where he was when he heard the shots and the minivan that was pulling up to pick up the individuals.

{¶ 29} Another camera angle showed the two males coming from the area of the minivan and walking to the areas by the bushes. The males appeared after the females ran by Father Kumse. He identified a flash depicted on another segment as evidence of the shot.

{¶ 30} Father Kumse identified the school, rectory, parking lot, and other areas of the parish campus on a map and recalled that he dropped the eggs that he collected from the chicken coop when he fell. A medical examination revealed severe inflammation and a tear to Father Kumse's left rotator cuff. Father Kumse was unable to identify the individuals.

{¶ 31} Det. Warnock and Detective Donald Nuti ("Det. Nuti") received an aggravated burglary report involving a minivan that was stolen from a juvenile group home. They also viewed a video of the Collinwood case incident that depicted a minivan that fit the description of the stolen vehicle. The group home

administrator identified group home resident J.M. as a possible participant in the minivan theft. The store owner provided information about T.P., one of the two females at the store that evening. T.P.'s name was also listed as a possible suspect in the minivan theft report.

{¶ 32} Det. Warnock and Det. Nuti met with J.M. and his parents. J.M. confessed that he was present at the incident and shot a gun twice. He also identified his accomplices and his description matched the events depicted in the surveillance videos. J.M. advised that the other suspects were staying at T.P.'s home and Det. Warnock and Det. Nuti located the minivan two houses north of T.P.'s house. (Tr. 68.) Det. Warnock and Det. Nuti knocked on the door. Kimbrough, M.M., and T.P. emerged while allegedly muttering M.B.K., the abbreviation for My Brother's Keeper gang.

{¶ 33} Kimbrough told Det. Warnock and Det. Nuti that T.P. hid a gun at her house. T.P.'s father gave permission to search. A .38 caliber firearm with six rounds and two spent casings were discovered in a bedroom. An inoperable .22 caliber semiautomatic pistol in the parent's room in a gun case. No shell casings were found at the crime scene. (Tr. 72.) Det. Warnock identified multiple photographs of the scene and the minivan.

{¶ 34} Det. Nuti interviewed A.W. who admitted his role in the Collinwood incident and identified the accomplices. "He said he was there, there were guns in the van, he held the gun that they went out to rob the priest, but he said he didn't need the gun and he left the gun in the car." (Tr. 147.) This testimony contradicts

the video and photographic evidence that shows A.W. point a gun and shoot at Father Kumse.

{¶ 35} T.P. pleaded guilty to aggravated robbery with a one-year firearm specification and tampering with evidence and agreed to testify against the others. T.P. identified photographs from the surveillance video and identified herself, K.M., the other female that was present, J.M., A.W., M.M., and Kimbrough whose nickname was "Man-Man." (Tr. 99.)

{¶ 36} T.P. met Kimbrough a year earlier and they talked almost daily. (Tr. 102.) T.P. identified a photograph of the minivan and admitted that, the day before the incident, Kimbrough was driving T.P., M.M., and J.M. around in the group home minivan. The next day, Kimbrough drove T.P., J.M., and M.M. to pick up K.M. and A.W. from school. They parked in the parish church parking lot so that T.P. and K.M. could visit a friend who lived in a house adjacent to the lot.

{¶ 37} The friend was not at home, so the two females headed to the store. They were running back across the parish pathway toward the van when they saw Father Kumse walking.

> [T]hat's when * * * J.M. and A.[W.] came out the bushes talking about I need everything and I thought they was talking to us because we had the cookies. But as soon as we got in the van, that's when everything happened. * * *
>
> That's when we heard the priest screaming and then we heard the gunshots.

(Tr. 117.) Kimbrough and M.M. were still in the van. J.M. and A.W. returned to the van and the group departed. They dropped off K.M. and A.W. and the others went to T.P.'s house.

{¶ 38} T.P. saw Kimbrough with a revolver at her house prior to the incident. A.W. had a gun at the parish campus and J.M. had the revolver. When police arrived, T.P. moved the revolver from the table beside her bed where Kimbrough had allegedly placed it and hid it in a closet. T.P. also confirmed that Kimbrough belonged to the M.B.K. gang.

{¶ 39} The group did not discuss committing a robbery when they were driving to the parish campus. T.P. did not see Kimbrough with a gun or hear him talk about a gun. The second gun discovered during the search of T.P.'s home was not the gun that A.W. had in the van during the Collinwood incident.

{¶ 40} The defense presented no witnesses or exhibits. We agree with the trial court's observation that T.P.'s testimony weighs heavily in favor of probable cause. Kimbrough, A.W., and J.M. "are all tied together" by the "admissions they made to law enforcement" and the testimony of T.P. (Tr. 169-170.)

{¶ 41} The evidence produced and the testimony of the Det. Warnock, Det. Nuti, Father Kumse, and T.P. establish that: (1) Kimbrough was at the scene; (2) he was driving the van; (3) shots were fired; and (4) he was complicit in the events. Kimbrough and the co-delinquents stayed at T.P.'s house after the incident. Kimbrough's possession of the revolver prior to and after the incident was established by T.P., though J.M. wielded the weapon during the attempted robbery.

{¶ 42} The probable cause standard is not as stringent as that of beyond a reasonable doubt. It considers whether the state has demonstrated more than a mere suspicion of guilt when weighed upon any evidence presented by the defense. *In re A.J.S.,* 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 42. The evidence and testimony support that Kimbrough drove the van, remained at the scene, and drove the group away after the incident. J.M. admitted, and T.P. confirmed, that he had a revolver during the commission of the incident, that shots were fired and that J.M. and A.W. returned to the van with guns. Thus, the aggravated robbery charge with the gun specification is supported.

{¶ 43} Further, the record supports the trial court's observations on the remaining counts, finding that Kimbrough

> [i]s at least on the probable cause level culpable with respect to the complicity. He was more than a bystander in this instance. Aiding and abetting, that is what [Kimbrough] was doing in this instance. Same thing holds true for the felonious assault * * * and the receiving stolen property [charges] with the one- and three-year gun spec.

(Tr. 175.) Also, supporting probable cause for tampering with evidence, "[a]t some point" subsequent to J.M. shooting the gun, it "finds its way into Kimbrough's hands" pursuant to T.P.'s testimony that Kimbrough put the revolver on the table by T.P.'s bed and T.P. hid the weapon when police arrived. (Tr. 174.)[2]

---

[2] As the state points out, Kimbrough was not convicted of tampering with evidence and so was not prejudiced as a result. *State v. Frazier*, 8th Dist. Cuyahoga Nos. 106772 and 106773, 2019-Ohio-1433, ¶ 30, citing *State v. Lenard*, 8th Dist. Cuyahoga No. 99149, 2013-Ohio-1995, ¶ 19 ("appellant benefits from a dismissal because he has one fewer conviction.").

{¶ 44} After a de novo review of the record, we do not find that the trial court abused its discretion by determining that probable cause exists that Kimbrough was a participant in the crimes charged. The trial court lawfully exercised the discretionary bindover determination and ordered a psychological examination prior to the amenability hearing.

## 2. Detention Center Case

{¶ 45} The probable cause hearing in this case was held on March 16, 2018, for co-delinquents Kimbrough, T.A., E.B., and D.W. Detention Center Activities Assistant Shauna Nevel ("Nevel") testified that a detention housing unit contains three living pods. Each living pod contains ten living cells for sleeping and a common living area. There is also a common day room for the three living pods in each housing unit that is only accessible by Detention Center permission. Detainees spend the majority of their time in the respective pods. When there are more than ten detainees per pod, "sleeping boats" are set up in the room.

{¶ 46} Twelve detainees were assigned to Kimbrough's pod the day of the incident. Nevel spent considerable time describing the security video depictions though she was not present the evening the incident occurred. Kimbrough, T.A., E.B., and two others were playing cards in the pod living area. A few minutes later, the detainees begin throwing playing cards, books, crates, flipping tables, and throwing other items in the room. Kimbrough is seen throwing books and a crate, a chair, and a staff table. Kimbrough's activities included using chairs to block the pod entrance, throwing a table, throwing a chair at the television, striking windows

with a table leg, jumping on sleeping boats, striking the television, water fountain, and ceiling lights with a table leg and throwing a table leg at various windows.

{¶ 47} Witnesses testified that the group was attempting to escape. The disturbance lasted for approximately 90 minutes with periodic calmer interludes.

{¶ 48} Cuyahoga County Sheriff's Deputy Antonios Makrinos ("Makrinos") responded with the S.W.A.T. unit to a "riot-type situation in one of the pods." (Tr. 82.) One of the pods had

> a bunch of smashed-up glass. The windows were smashed. A bunch of males had pipes. I believe they were the legs of a table. They were hitting windows. They spilled liquids all over the floors and were not compliant with any orders from the staff.

(Tr. 82.) The detainees were taunting the officers, forcefully hitting the window glass with table legs and failed to obey directions. Makrinos described T.A. and E.B. as the apparent ring leaders.

{¶ 49} Cuyahoga County Sheriff's Deputy Chris Cepik ("Cepik") echoed Makrinos's observations. Cepik added that water was pouring from the damaged sprinkler system and detainees were lathering their bodies with soap.

{¶ 50} Kimbrough was charged with: escape, R.C. 2921.34(A)(1); inciting to violence, R.C. 2917.01(A)(1) and (A)(2); aggravated riot, R.C. 2917.02(B)(2) and (A)(2); vandalism, R.C. 2909.05 (B)(2); possessing criminal tools, R.C. 2923.24(A); and disorderly conduct, R.C. 2917.11(A)(5). The parties stipulated to damages in the amount of $7,500 or more.

{¶ 51} The trial court emphasized that the participants "acted together." (Tr. 150.) "This was a group effort, not individuals committing one particular act, but a group committing several acts together." *Id.*

{¶ 52} R.C. 2921.34(A)(1) provides that a person under detention shall not knowingly, or purposely attempt to break the detention. "Detention" is defined as "confinement in any public or private facility for custody of persons charged with or convicted of a crime." R.C. 2921.01(E). The trial court explained that attempting to leave an area of detention includes the building, the pods and other locked, separate detention areas within the facility. Of import in the determination is the photograph of the pod's back exterior window. The force applied to the window was focused on a concentrated area that indicates the intent to break the window, meeting the threshold of probable cause for the charge against Kimbrough, T.A., and E.B.

{¶ 53} R.C. 2917.02(B)(2), aggravated rioting, provides that "[no] person, being an inmate in a detention facility, shall violate division (A)(2) of this section or section 2917.03 [governing riots] of the Revised Code." R.C. 2917.02(A)(2) states that "[n]o person shall participate with four or more others in a course of disorderly conduct pursuant to R.C. 2917.11 * * * with purpose to commit or facilitate the commission of any offense of violence."

{¶ 54} The video and testimony support the trial court's finding of probable cause for aggravated rioting and Kimbrough's active involvement with E.B., T.A., D.W. along with the others in the pod:

The video clearly indicates that there were four or more people engaged in a course of disorderly conduct with the purpose to intimate a public official, employee, into taking or refraining from official action or the purpose to hinder, impede or obstruct the function of government.

All those guards were standing outside. The police officers were standing outside, not wanted to enter because of the behavior [of] these young men.

They were being intimidated by their behavior, flexing, throwing up what the officers believed to be gang signs, although they weren't specific in being able to name them, but they believed that that's what they were, but as a way to intimidate them and prevent them or hinder them from being able to engage in their official acts, to hinder, to impede or obstruct it.

(Tr. 155-156.)

{¶ 55} Finally, there is probable cause for the vandalism elements under R.C. 2909.05(B)(2):

No person shall knowingly cause serious physical harm to property that is owned, leased, or controlled by a governmental entity. A governmental entity includes, but is not limited to, the state or a political subdivision of the state, a school district, the board of trustees of a public library or public university, or any other body corporate and politic responsible for governmental activities only in geographical areas smaller than that of the state.

The parties stipulated that the facility damage exceeded $7,500. The housing unit was closed for repairs for several months and 44 detainees were transferred to other units.

{¶ 56} After a de novo review of the record, we do not find the trial court's determination of probable cause that Kimbrough committed the crimes charged constitutes an abuse of discretion.

C.     Conclusion

{¶ 57} The first assigned error lacks merit.

## IV. Amenability

### A. Standard of Review

{¶ 58} We review a challenge to the juvenile court's determination on amenability for an abuse of discretion. *State v. Johnson*, 2015-Ohio-96, 27 N.E.3d 9, ¶ 36 (8th Dist.), citing *State v. Jones*, 8th Dist. Cuyahoga No. 99044, 2013-Ohio-3725, ¶ 9, citing *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 39.

> [A] "juvenile court enjoys wide latitude to retain or relinquish jurisdiction." *State v. Watson*, 47 Ohio St.3d 93, 95, 547 N.E.2d 1181 (1989). And given the discretion afforded the juvenile court by the legislature in determining a juvenile's amenability to the juvenile justice system, "[i]f there is some rational and factual basis to support the trial court's decision, we are duty bound to affirm it regardless of our personal views of the evidence." *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.). We therefore will not reverse a juvenile court's decision to transfer unless the decision was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158, 404 N.E.2d 144 (1980).

*Johnson* at ¶ 36.

{¶ 59} R.C. 2152.12(B) and Juv.R. 30 provide as to discretionary transfers:

> "Under R.C. 2152.12(B), after a complaint has been filed charging a child with offenses that would be a felony if committed by an adult, a juvenile court may transfer jurisdiction to the general division of the common pleas court if it finds that (1) the child was 14 years of age or older at the time of the act; (2) there is probable cause that the child committed the act; and (3) the child is not amenable to rehabilitation within the juvenile justice system and, to ensure the safety of the community, the child should be subject to adult sanctions."

*Johnson* at ¶ 33, quoting *Jones* at ¶ 7.

{¶ 60} Juv.R. 30(C) provides:

Discretionary transfer. In any proceeding in which transfer of a case for criminal prosecution is permitted, but not required, by statute, and in which probable cause is found at the preliminary hearing, the court shall continue the proceeding for full investigation. The investigation shall include a mental examination of the child by a public or private agency or by a person qualified to make the examination. When the investigation is completed, an amenability hearing shall be held to determine whether to transfer jurisdiction. The criteria for transfer shall be as provided by statute.

{¶ 61} A hearing was conducted pursuant to R.C. 2152.12(B) to determine whether Kimbrough's amenability to rehabilitation in the juvenile system or for transfer. Pursuant to R.C. 2152.12(C), the juvenile court ordered an investigation of Kimbrough's history, education, mental state, family situation, "and any other factor bearing on whether the child is amenable to juvenile rehabilitation." *Id.*

{¶ 62} R.C. 2152.12(D) and (E) list the factors to consider for and against bindover. The preamble for each subsection explains that a trial court "shall" consider the listed factors but may also consider "any other relevant factors." *Id. See also Johnson*, 2015-Ohio-96, 27 N.E.3d 9, ¶ 35, citing *Jones*, 8th Dist. Cuyahoga No. 99044, 2013-Ohio-3725, ¶ 8.

{¶ 63} R.C. 2152.12(D) lists factors that support transfer of jurisdiction of the case:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 64} R.C. 2152.12(E) lists factors to be considered that support retention of jurisdiction by the juvenile court.

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6)     The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7)     The child has a mental illness or intellectual disability.

(8)     There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 65} Both statutes allow the juvenile court to consider "any other factors deemed relevant" to determine amenability. *Johnson*, 2015-Ohio-96, 27 N.E.3d 9, ¶ 35, citing *Jones,* 8th Dist. Cuyahoga No. 99044, 2013-Ohio-3725, ¶ 8.

B.     Discussion

{¶ 66} The Collinwood and Detention Center cases were consolidated for the May 4, 2018 amenability hearing. The state called Father Kumse, Det. Warnock, Jenkins, the group homeowner, and Cuyahoga County Sheriff's Sergeant Thomas Bradley. Photographic and video evidence was also admitted.

{¶ 67} Father Kumse briefly described the events and testified to the economic and psychological harm aspects of the amenability factors. In addition to the fear of being shot, Father Kumse suffered a partial tear to his rotator cuff, has received medication and therapy and will probably need surgery. He has difficulty sleeping, no longer walks the dog in the evening and seeks cover when he hears shots in the neighborhood.

{¶ 68} Detective Warnock testified that the M.B.K. gang is a Lakeshore gang affiliate. Kimbrough, also known as "Lakesho Man Man," A.W., M.M., and J.M. are members of M.B.K. A tag is a gang sign used to take credit for a crime. A car parked in the parish campus parking lot the night of the Collinwood incident

contained the tag "Lakesho Man Man" and "M.B.K." (Tr. 15-16.) One of the walls on the upper level of T.P.'s house was marked "Lakesho Man Man, and M.B.K. Main." (Tr. 16.) Det. Warnock also testified that the juveniles arrested at J.P.'s house softly repeated "M.B.K." to each other. (Tr. 17.)

{¶ 69} Jenkins recounted the events and testified to the disruptions to protocol and expenses incurred by the county. Repairs were ongoing at the time of the hearing but were estimated at $200,000.

{¶ 70} Sergeant Bradley identified the contents of a video taken March 16, 2018, of holding cell eight for the trial court. Kimbrough is writing or scratching graffiti on the wall that Detective Warnock testified said "[f]ree Lakeshore Man Man" and "[f]*ck T.T., she a snitch." (Tr. 19.)

{¶ 71} Kimbrough argues that he is amenable to rehabilitation in the juvenile system and the evidence presented in this case does not overcome the presumption of retention in the juvenile system under. R.C. 2152.12(B)(3).

> (B) Except as provided in division (A) of this section, after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:
>
> (1) The child was fourteen years of age or older at the time of the act charged.
>
> (2) There is probable cause to believe that the child committed the act charged.
>
> (3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall

consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.

{¶ 72} More specifically, Kimbrough argues:

The juvenile court cannot fail to consider available treatment options in the juvenile system merely because the youth was involved in the immature acts of destroying and/or defacing Detention Center property.

The juvenile court cannot ignore obvious evidence of immaturity, poor judgment, unformed and/or undeveloped character, and susceptibility to negative influences and peer pressure.

The juvenile court lost focus on the statute's presumption of retention in the juvenile system and disregarded the professional assessment that numerous factors suggested Kimbrough was amenable to treatment.

The juvenile court never considered the wide array of dispositional options available to it for this young teen.

The juvenile court did not consider how Kimbrough would fare in adult prison.

The record does not support Kimbrough's assertions.

{¶ 73} The trial court determined as to both cases that "the results of previous juvenile sanctions and programs show rehabilitation will not occur in the juvenile system." (Tr. 48.) R.C. 2152.12(D)(7).

### 1. Collinwood Case

{¶ 74} In the Collinwood case, the trial court found that Father Kumse "suffered physical harm" and residual shoulder problems that support transfer under R.C. 2152.12(D)(1). (Tr. 49.)

> [Father Kumse] has now further corroborated the issue that his shoulder has caused him some significant problems wherein he's going to have to have surgery at some point to relieve the problems that he's having sleeping and just operating the shoulder on a daily basis.

*Id.* The trial court did not consider Father Kumse's age to be a factor supporting transfer under R.C. 2512.12(D)(2) because there was no "connection between" his "age and his injury." *Id.*

{¶ 75} Kimbrough did not have a relationship with the victim negating R.C. 2152.12(D)(3). The trial court determined that Kimbrough's gang affiliation supported transfer under R.C. 2152.12(D)(4) based on the evidence presented at the amenability hearing and T.P.'s testimony during the probable cause hearing. "There's testimony from Detective Warnock about the Lakeshore Gang and the feeder gangs and one of them being M.B.K." (Tr. 50.)

> And then we have video evidence of him defacing the property here with Lakeshore Man Man, Free Lakeshore Man Man, and that's Terrance Kimbrough actually causing that in the wall.
>
> That's enough for the Court to find that he's part of a gang and the tag at the place of the incident shows that it's connected with that incident, so the Court finds that that particular factor is applicable.

(Tr. 51.)

{¶ 76} R.C. 2152.12(D)(5) did not support transfer because Kimbrough did not possess or control a firearm at the time of the act, and there is no indication in the statute that complicity is a consideration. Kimbrough was not on parole, awaiting adjudication, community control or otherwise subject to R.C. 2152.12(D)(6).

{¶ 77} The trial court did find that R.C. 2152.12(D)(7) was satisfied. Though Kimbrough completed probation for the rape charge, the trial court rejected the claim that Kimbrough's completion of probation was a success. "[F]or me successful completion means that you don't come back to the Court." (Tr. 52-53.) "Instead we have 13 subsequent charges against [Kimbrough] after he successfully completed probation." (Tr. 53.) These facts, coupled with his behavior in the Detention Center case, demonstrated to the court that Kimbrough would not be rehabilitated in the juvenile system.

{¶ 78} The trial court held that Kimbrough was emotionally, physically, or psychologically mature enough for the transfer under R.C. 2152.12(D)(8) and that there is no indication in the Psychological Evaluation Report ("PER") that he suffered from mental health issues or is psychologically, emotionally, or physically immature. (Tr. 54.)

{¶ 79} The court did not find that transfer under R.C. 2152.12(D)(9) is supported by the record:

> The Court does not find, however, that there is insufficient time for rehabilitation in the Juvenile System just based on his age. He has not reached the age of majority. He has at least two years under that status.
>
> Additionally, the Court does have jurisdiction for five years because if the Court decide that he is amenable and he's found delinquent in [this case] as well as the [Detention Center] case, the Court could construct a disposition that keeps him at the Ohio Department of Youth Services until he's 21.

 (Tr. 54-55.) "So based on the Court's assessment, there are four out of nine factors favoring transfer, and that's for the [Collinwood case]." (Tr. 55.)

{¶ 80} The trial court then addressed the R.C. 2152.12(E) factors that support the trial court's retention of jurisdiction. The evidence did not support that Kimbrough acted under provocation, induced the act, was the principal offender or was under the influence of or coerced by another. R.C. 2152.12(E)(1)-(3). The trial court held that Kimbrough's acts caused harm pursuant to Father Kumse's testimony and Kimbrough had been previously found delinquent so that R.C. 2152.12(E)(4)-(5) did not support retention. The trial court also determined that Kimbrough is psychologically, physically, and emotionally mature enough for transfer and is not mentally ill or mentally challenged. R.C. 2152.12(E)(6)-(7).

{¶ 81} The trial court reiterated its finding that sufficient time existed for Kimbrough to be rehabilitated in the juvenile system. However, the trial court disagreed that the level of security in the juvenile system provides a reasonable assurance of public safety pursuant to R.C. 2152.12(E)(8).

> Well, I can't necessarily say that if in fact he participates or there's probable cause indicating that he's participated in acts which destroy the very system that we have here to ensure that the public will be safe.
>
> Additionally, he is engaged in assaultive behaviors, destroying property that belongs to the public and, therefore, only half of that factor would be applicable.
>
> And so the Court find there's one and a half factors against transfer versus four factors favoring transfer.

(Tr. 56-57.)

{¶ 82} Finally, the trial court considered the seriousness of the aggravated robbery offense.

I had the opportunity to watch the video where [Father Kumse] is being chased ty two individuals firing guns at him, a defenseless elderly priest whose only responsibility that night was to check on the chicken coop and then he is frightened to the point where he things that he's about to lose his life all for what?

And Terrance Kimbrough, while he may not have been one of the individuals firing the gun, he still was involved. He still was complicit as much as they were because he was there, and based on the testimony that the Court recalls, they had all been together most of the day.

So it's not a surprise that this particularly incident was about to transpire. You know, they all jumped back into this car with [Kimbrough] and they all left together.

(Tr. 57-58.)

{¶ 83} The trial court concluded that Kimbrough "is not amenable to care or rehabilitation of the Juvenile Justice System and the * * * safety of the community requires that he — or may indicate that adult sanctions should be imposed." (Tr. 58.) "[T]he Court's going to grant the State's motion on this case to relinquish jurisdiction." *Id.*

{¶ 84} The final judgment entry states that Kimbrough was 15 years of age at the time of the incident and that probable cause had been demonstrated for all counts charged in the Collinwood case.

The court finds after a full investigation, including a mental examination of said child made by a duly qualified person, and after full consideration of the child's prior juvenile record, family environment, school record, efforts previously made to treat and rehabilitate the child including prior commitments to the Department of Youth Services, the nature and severity of the offense, herein, the age physical and mental condition of the victim as effected by the matter herein, and other matters of evidence, that there are reasonable grounds to believe that the child herein is not amenable to care or rehabilitation within the juvenile system.

The court further finds that the safety of the community may require that the child be subject to adult sanctions.

Journal entry No. 0911185834 (May 8, 2018), p. 3.

{¶ 85} The entry listed as factors in favor of transfer pursuant to R.C. 2152.12(D):

The victim suffered physical or psychological harm, or serious economic harm.

The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

The child is emotionally, physically, or psychologically mature enough for transfer.

*Id.*

{¶ 86} The R.C. 2152.12(E) factors in favor of retaining jurisdiction in the juvenile court:

The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

There is sufficient time to rehabilitate the child within the juvenile system, and the level of security available in the juvenile system provides a reasonable assurance of public safety.

*Id.*

2. Detention Center Case

{¶ 87} The trial court reviewed each of the factors supporting bindover under R.C. 2152.12(D). The victim suffered serious economic harm. R.C. 2152.12(D)(1). The physical and mental harm of the victim did not apply.

R.C. 2152.12(D)(2). However, the trial court found that R.C. 2152.12(D)(3) was supported. "The victim is the" Detention Center. (Tr. 59.) "But for" Kimbrough's detention at the center, "he would not have been able to facilitate this act." (Tr. 59.)

{¶ 88} Kimbrough did not act for hire, as part of a gang or brandish a firearm under R.C. 2152.12(D)(4)-(5). R.C. 2152.12(6) favored transfer because Kimbrough was awaiting adjudication in the Collinwood case at the time of the Collinwood incident. R.C. 2152.12(D)(7) also supported transfer. Kimbrough's presence before the trial court on the current charges indicated that previous juvenile sanctions were not successful.

{¶ 89} The trial court determined that Kimbrough was emotionally, physically, and psychologically mature enough for transfer, and that sufficient time exists for rehabilitation in the juvenile system under R.C. 2152.12(D)(8)-(9). Five of the nine factors supported transfer.

{¶ 90} The R.C. 2152.12(E) analysis of factors against transfer resulted in the following findings, listed by subsection: (1) the Detention Center did not induce or facilitate the act; (2) Kimbrough did not act in provocation; (3) Kimbrough was not the principal actor; (4) Kimbrough did cause harm; (5) Kimbrough was previously adjudicated delinquent; (6) Kimbrough is emotionally, physically, and psychologically mature enough for transfer; and (7) Kimbrough is not mentally ill. Under subsection (8), the trial court again determined that sufficient time exists to rehabilitate Kimbrough in the juvenile system, but the level of security available does not support retention.

{¶ 91} The trial court concluded,

So it's one and a half factors against transfer. And again, seriousness of the act, the destruction of the Detention Center, that was just outrageous what I witnessed.

And then what caused me even more consternation and anger with [Kimbrough] and finding that * * * he believes that the Juvenile Justice System is a joke is his behavior in that back [holding] cell and his continued inability to be compliant with the rules all the time instead of engaging in physical altercations with individuals downstairs while he's been confined.

This is a big joke to him, and since that's the case, we're going to send him where maybe he doesn't think it's a big joke and he'll take it more seriously.

The Court find this time again he is not amenable to the care and rehabilitation of the Juvenile Justice System.

The Court finds that the safety of the community may require that those sanctions be imposed and, therefore, the Court is going to relinquish its jurisdiction over this matter.

(Tr. 62-63.)

C.      Conclusion

{¶ 92} In both cases, the trial court considered Kimbrough's Ohio Youth Assessment System Report and the parties stipulated to the content of the PER. The documents included information about Kimbrough's prior rape conviction in 2014 that resulted in the imposition of a community control sanction ("CCS"). Also, according to the reports, Kimbrough did not show remorse or accept responsibility for the rape. He completed CCS and a couple of years later engaged in the Collinwood and Detention Center incidents. The reports did not indicate that Kimbrough suffered from medical, mood, or thought disturbances.

{¶ 93} The record demonstrates that the juvenile court carefully considered the factors of R.C. 2152.12(D) and (E), and "ultimately determined," wholly within the juvenile court's discretion, "that the factors in favor of transfer outweighed the factors in favor" of retaining jurisdiction. "We cannot say that the trial court's decision constitutes an abuse of discretion." *Johnson*, 2015-Ohio-96, 27 N.E.3d 9, at ¶ 44.

## V. Sentence

### A. Contrary to Law

{¶ 94} Kimbrough argues that his seven-year sentence is contrary to law and is not supported by the record. He seeks relief under *State v. Jones*, 2018-Ohio-498, 105 N.E. 702 (8th Dist.) (en banc) and R.C. 2953.08. In *Jones*, an en banc panel of this court "held that appellate review of felony sentences 'includes the considerations under R.C. 2929.11 and the findings under 2929.12.'" *State v. Kovatch*, 8th Dist. Cuyahoga No. 108453, 2020-Ohio-1025, ¶ 23, quoting *Jones* at ¶ 9.

{¶ 95} However,

> [W]e may disturb a felony sentence only if we clearly and convincingly find that either "the record does not support the sentencing court's findings" or "the sentence is otherwise contrary to law." R.C. 2953.08(G)(2); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1, 21-23.

*State v. Bush*, 8th Dist. Cuyahoga No. 106392, 2018-Ohio-4213, ¶ 22.

{¶ 96} We are aware that

> [a] plea of guilty is a complete admission of guilt. A defendant who enters a plea of guilty waives the right to appeal all nonjurisdictional

> issues arising at prior stages of the proceedings, although the defendant
> may contest the constitutionality of the plea itself.

(Citations omitted.) *State v. Bogan*, 8th Dist. Cuyahoga No. 84468, 2005-Ohio-3412, ¶ 14. However, we elect to address the issue in the interest of justice under the unique circumstances of this case.

{¶ 97} Kimbrough was convicted in the Collinwood case for: Count 2, felonious assault, R.C. 2903.11(A)(2), a second-degree felony; Count 3, aggravated robbery, R.C. 2911.01(A)(1), a first-degree felony; and Count 6, receiving stolen property, R.C. 2913.51(A), a fourth-degree felony. Two of the counts included one-year firearm and two weapons forfeiture specifications. The convictions in the Detention Center case were for: Count 1, escape, R.C. 2921.34(A)(1), a second-degree felony; Count 4, aggravated riot, R.C. 2917.02(B)(2), a third-degree felony; and Count 6, vandalism, R.C. 2909.05(B)(2), a fourth-degree felony.

{¶ 98} The Collinwood Counts 2 and 3 merged as allied offenses and sentencing proceeded on Count 3 for six years on the base charge plus the one-year firearm specification, an 18-month concurrent term on Count 6, five years of mandatory postrelease control and forfeiture of the handgun. The Detention Center sentence was for two years on Count 1, 12 months on Count 4 and nine months on Count 6 run concurrently with each other and with the seven-year sentence in the Collinwood case.

{¶ 99} The sentencing range for aggravated robbery is three to ten years under R.C. 2929.14(A)(1). Kimbrough's sentence was for six years with the one-year

firearm specification.  A firearm specification is a sentencing provision and is not a separate offense subject to merger.  *State v. Williams*, 8th Dist. Cuyahoga No. 81949, 2003-Ohio-3950, ¶ 19-21.

{¶ 100} In Ohio,

> [a] sentence is contrary to law if the sentence falls outside the statutory range or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12. *See, e.g., State v. Pawlak*, 8th Dist. Cuyahoga No. 103444, 2016-Ohio-5926, ¶ 58; *State v. Keith*, 8th Dist. Cuyahoga Nos. 103413 and 103414, 2016-Ohio-5234, ¶ 8, citing *State v. Hinton*, 8th Dist. Cuyahoga No. 102710, 2015-Ohio-4907, ¶ 10.

*State v. Jung*, 2018-Ohio-1514, 111 N.E.3d 54, ¶ 14 (8th Dist.).

{¶ 101} Kimbrough's sentence is not contrary to law.  In addition, the record supports the trial court's full consideration of the principles and purposes of felony sentencing the applicable factors per R.C. 2929.11 and 2929.12.

{¶ 102} We do not find that Kimbrough's sentence is contrary to law.

B.   Disproportionate Sentence

{¶ 103} Kimbrough also argues that his sentence was disproportionate to that of the codefendants and similar offenders.  We review this challenge for plain error because it was not made in the trial court.  "Under the plain-error analysis" a party is required to "'establish that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions.'" *State v. Thompson*, 8th Dist. Cuyahoga No. 96929, 2012-Ohio-921, ¶ 17, quoting *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996).

{¶ 104} Kimbrough argues that he has never been imprisoned and that his youth should be considered as a mitigating factor. He also argues that he was not a leader, but a follower, in this case and that the psychological expert determined that Kimbrough "would be responsive to the care and rehabilitative service available through the Juvenile Justice System." PER (Apr. 25, 2018), p. 7-8.

{¶ 105} Kimbrough completed his ninth-grade coursework while incarcerated in the case. His family appeared to demonstrate their support. His mother and grandmother apologized to Father Kumse and expressed their remorse. Kimbrough also accepted responsibility and apologized for his actions. He promised that he would use the period of incarceration to "come back a better person." (Tr. 52-53.) Defense counsel shared Kimbrough's aspirations to attend college and pursue architecture.

{¶ 106} Father Kumse expressly and eloquently accepted Kimbrough's apology and prayed that the difficult lesson would make him a better man. The state said at sentencing that Kimbrough apparently did not initiate the Detention Center incident but elected to join in. Also, T.P. said Father Kumse was a target of opportunity to secure money for gasoline.

{¶ 107} Kimbrough also argues the sentence is contrary to law because it is disproportionate to T.P.'s sentence who was not boundover for adult adjudication. T.P., however, entered into a plea agreement that included testifying against the others. The record reflects the revolver used in the Collinwood incident belonged to

Kimbrough and that Kimbrough was the driver of the vehicle involved. In contrast, codefendant J.M. was sentenced to nine years for his involvement in the case.

{¶ 108} This court has recognized:

> The courts have not interpreted the notion of consistency to mean equal punishment for codefendants. *State v. Harder*, 8th Dist. Cuyahoga No. 98409, 2013-Ohio-580, ¶ 7. Consistency is not synonymous with uniformity. *State v. Black*, 8th Dist. Cuyahoga No. 100114, 2014-Ohio-2976, ¶ 12. Rather, the consistency requirement is satisfied when a trial court properly considers the statutory sentencing factors and principles. *State v. O'Keefe*, 10th Dist. Franklin Nos. 08AP-724, 08AP-725, and 08AP-726, 2009-Ohio-1563, ¶ 41. "'[C]onsistency is achieved by weighing the factors enumerated in R.C. 2929.11 and 2929.12 and applying them to the facts of each particular case.'" *State v. Wells*, 8th Dist. Cuyahoga No. 100365, 2014-Ohio-3032, ¶ 12, quoting *State v. Lababidi*, 8th Dist. Cuyahoga No. 100242, 2014-Ohio-2267, ¶ 16. Consistency "'requires a trial court to weigh the same factors for each defendant, which will ultimately result in an outcome that is rational and predictable.'" *State v. Georgakopoulos*, 8th Dist. Cuyahoga No. 81934, 2003-Ohio-4341, ¶ 26, quoting *State v. Quine*, 9th Dist. Summit No. 20968, 2002-Ohio-6987, ¶ 12.

*State v. Cargill*, 8th Dist. Cuyahoga No. 103902, 2016-Ohio-5932, ¶ 11.

{¶ 109} In addition,

> "[c]onsistency accepts divergence within a range of sentences and takes into consideration the trial court's discretion to weigh statutory factors." *State v. Hyland*, 12th Dist. Butler No. CA2005-05-103, 2006-Ohio-339. *See also State v. Switzer*, 8th Dist. Cuyahoga No. 102175, 2015-Ohio-2954; *State v. Armstrong*, 2d Dist. Champaign No. 2015-CA-31, 2016-Ohio-5263; *State v. Murphy*, 10th Dist. Franklin No. 12AP-952, 2013-Ohio-5599, ¶ 14. "Although the offenses may be similar, distinguishing factors may justify dissimilar treatment." *State v. Dawson*, 8th Dist. Cuyahoga No. 86417, 2006-Ohio-1083, ¶ 31.

*Id.* at ¶ 12.

{¶ 110} We do not find that Kimbrough's sentence is disproportionate.

C.      Serious Youthful Offender

{¶ 111} Kimbrough also suggests that the trial court should have exercised other dispositional options such as blended sentencing for serious youth offenders "SYO."

> "'A juvenile charged as a potential serious youthful offender does not face bindover to an adult court; the case remains in the juvenile court. Under R.C. 2152.11(A), a juvenile defendant who commits certain acts is eligible for 'a more restrictive disposition.' That 'more restricted disposition' is a 'serious youthful offender' disposition and includes what is known as a blended sentence — a traditional juvenile disposition coupled with the imposition of a stayed adult sentence. R.C. 2152.13. The adult sentence remains stayed unless the juvenile fails to successfully complete his or her traditional juvenile disposition. R.C. 2152.13(D)(2)(a)(iii). Theoretically, the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning as both carrot and stick.'"

Appellant's brief, p. 33, quoting *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 18.

{¶ 112} SYO designations may only be invoked under certain circumstances. "Juvenile courts are unique and are tied to the goal of rehabilitation." *Id.* at 549. The primary goal of juvenile sentencing is to:

> "provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender."

*Id.*, quoting R.C. 2152.01(A). In contrast, "[t]he purposes of felony sentencing, on the other hand, 'are to protect the public from future crime by the offender and others and to punish the offender.' R.C. 2929.11(A)." *Id.*

{¶ 113} Notwithstanding the purpose and policy of the SYO designation, a juvenile judge may only impose a blended sentence where initiated against a juvenile

pursuant to the statute by indictment (R.C. 2152.13(A)(1)), bill of information, where the prosecution requests a designation in the original complaint or by filing a timely notice of intent with the trial court (R.C. 2152.13(B)). An SYO designation was not available in this case. The prosecution did not seek a designation in this case.

{¶ 114} Moreover,

> Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety.

*State v. Hanning*, 89 Ohio St.3d 86, 90, 2000-Ohio-436, 728 N.E.2d 1059.

{¶ 115} The final assigned error is without merit.

## VI. Conclusion

{¶ 116} The trial court's judgment is affirmed. However, we remand this case to the trial court to enter a nunc pro tunc order consistent with this opinion.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN T. GALLAGHER, A.J., CONCURS IN JUDGMENT ONLY;
LARRY A. JONES, SR., J., DISSENTS WITH SEPARATE OPINION

LARRY A. JONES, SR., J., DISSENTING:

{¶ 117} R.C. 2152.01 outlines the overarching principles a juvenile court should keep in mind when rendering its dispositions. The statute provides in relevant part as follows:

(A) *The overriding purposes for dispositions under this chapter are to provide for the care, protection, and mental and physical development of children subject to this chapter*, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender. These purposes shall be achieved by a system of graduated sanctions and services.

(B) Dispositions under this chapter shall be reasonably calculated to achieve the overriding purposes set forth in this section, commensurate with and not demeaning to the seriousness of the delinquent child's or the juvenile traffic offender's conduct and its impact on the victim, and consistent with dispositions for similar acts committed by similar delinquent children and juvenile traffic offenders. The court shall not base the disposition on the race, ethnic background, gender, or religion of the delinquent child or juvenile traffic offender.

(Emphasis added.) R.C. 2152.01(A) and (B).

{¶ 118} I strongly disagree that the juvenile court's bindover in this case achieved the above-stated purposes and, therefore, I respectfully dissent.

**Purposes and Principles**

{¶ 119} In dissenting, I feel that a brief overview of the historical context of the juvenile justice system and recent research on juvenile offenders in the adult criminal system is appropriate.

{¶ 120} Initially, the juvenile justice system had a bent toward rehabilitating troubled youth who committed crimes. Briana Morris, *A Child is a Child, Except under Ohio Law: A Discretionary Review of Mandatory Bindovers*, 47 Cap. U.L. Rev. 639, 640 (2019), citing Feld, *The Evolution of the Juvenile Court: Race, Politics, and the Criminalizing of Juvenile Justice* (2017); *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956-83 N.E.3d 883, ¶ 63-64 (O'Connor, C.J., dissenting). The rehabilitative approach moved through the years to a "scaled-down criminal" approach, and eventually to a "get tough" approach. Morris at 642-643.[3] The get tough approach was the result of a belief that rehabilitation was failing. *Id.* at 643-644. The tougher approach was rooted in the belief that harsher sentences for youths would help them more than rehabilitation would. *Id.* In my opinion, the court took a get tough approach in this case and said as much when it stated the following at the disposition hearing: "This is a big joke to him, and since that's the

---

[3] *See* Morris at 643 for a discussion of the effects of the introduction of crack cocaine in inner cities and the effect it had on crime among African-American youths, all while widening the arrest rates for African-American youth and their counterpart white juvenile offenders. In 1984, "'[b]lack youths' Violent Crime Index arrests started at a rate six times that of white youths * * * and by 1994 rose to * * * a 58% increase.'" *Id.* at 644, quoting Feld at 84.

case, we're gonna send him where maybe he doesn't think it's a big joke and he'll take it more seriously."

{¶ 121} The goal of the get tough approach was to protect society and to keep delinquent youths off the streets. *Id.* But research has shown that any short-term public protection of incarceration of the youth is offset by the developmental disruption and increased likelihood of future recidivism. *See generally* Morris at 666-673. For example, "'[y]ouths tried as adults reoffend more quickly and more seriously, thereby negating any short-term crime reduction.'" Morris at 669, quoting Feld at 122. Simply, the long term effects on youth being sentenced as adults have lasting, harmful individual and societal effects.

{¶ 122} "'Imprisoning juveniles increases rather than decreases the amount of subsequent offending.'" Morris at 668, quoting Feld at 118. Further, juvenile offenders in adult prisons are at an increased risk for victimization due to their smaller size, physical strength, social skills, and lack of sophistication. Morris at *id.*, citing Feld at *id.* Prison does not foster the appropriate environment for youths to be able to form an identity, acquire social skills, or make successful transitions to adulthood. Morris at *id.*, citing Griffin, *Office of Juvenile Justice and Delinquency Prevention, Trying Juveniles as Adults: An Analysis of State and Transfer Laws and Reporting* 4, 26 (2011).

{¶ 123} Studies of juvenile crime rates before and after passage of get tough laws showed that the get tough laws did not have the deterrent effect that many thought they would. Morris at *id.*, citing Feld at 120. The Center for Disease

Control's Task Force on Community Preventive Services, for example, reviewed studies that compared outcomes of youths transferred to adult criminal court with those who remained in the juvenile justice system. Morris at *id.*, citing Feld at 121. The conclusion: "'youths tried as adults had higher and faster recidivism rates, especially for violent crimes, than their delinquent counterparts.'" Morris at *id.*, citing Feld at *id.*

{¶ 124} Of course, there are other collateral consequences of sending juveniles to adult prisons. For instance, "'teens under eighteen being held in adult jails are nineteen times more likely to commit suicide than teens in general and thirty-six times more likely than those held in juvenile facilities.'" Morris at 669, quoting Laird, *States Raising Age for Adult Prosecution Back to 18*, ABA Journal (Feb. 2017).

{¶ 125} Until then-President Barack Obama halted the practice in 2016, juveniles who were sexually assaulted or faced other problems in prison were often held in solitary confinement. Morris at *id.*, citing Laird at *id.* "'Many of the youth already have existing issues that are only aggravated by the solitary confinement and many have suffered abuse, neglect, or another form of trauma at some point in their life.'" Morris at *id.*, quoting Laird at *id.*

{¶ 126} In short, transferring juveniles to the adult prison system "implicates the punitive aspect of sentencing and deprives the juvenile of access to the

rehabilitative hallmarks of the juvenile-justice system." *Aalim*, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 68 (O'Connor, C.J., dissenting).[4]

**Discretionary Bindovers**

{¶ 127} Discretionary bindovers, as occurred here, are for children aged 14 or older when there is probable cause to believe that the child committed the charged act, the child is not amenable to care or rehabilitation within the juvenile justice system, and the safety of the community may require that the child be subject to adult sanctions. However, before the transfer, the judge is allowed to order an investigation into the child's social history, education, family situation, and any other factors bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child, as well as the factors under R.C. 2152.12(E).

{¶ 128} Although discretionary bindovers require probable cause determinations, many discretionary bindover decisions turn on whether a minor was amenable to care or rehabilitation within the juvenile system.

> In contrast to a probable-cause determination, a denial of a discretionary-bindover request on the basis of amenability does not necessitate dismissal of any of the charges in the complaint. Rather, the juvenile court retains jurisdiction of the case, the complaint continues

---

[4] *See* Morris at 670-672 for a discussion of a study conducted on data involving youth from the New York and New Jersey juvenile justice systems; New York's age of majority for criminal offending is statutorily set at 16, while New Jersey's age is 18. The conclusion: "juvenile prisons are a better option than adult prisons for young offenders. The overall lasting psychological effects on the juvenile outweigh the fact that adult courts offer a wider array of services and seem marginally more effective at preventing crimes." *Id.* at 671-672, citing Fagan & Kupchick, *Juvenile Incarceration and the Pains of Imprisonment*, 3 Duke F.L. Soc. Change 57-58 (2011).

as it was filed, and if appropriate, the child is prosecuted as a serious youthful offender under R.C. 2152.11.

*In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 15.

{¶ 129} The crux of my disagreement with the majority's decision relates to its determination regarding Kimbrough's amenability to care or rehabilitation within the juvenile system. There is no question that Father Kumse suffered physical and emotional harm and the detention center was damaged. The record also shows that Kimbrough had a juvenile adjudication from when he was 11 years old, and that the detention center incident occurred while he was awaiting adjudication for the Collinwood case. But for the reasons discussed below, I would find the juvenile court's decision on Kimbrough's amenability an abuse of discretion.

{¶ 130} The amenability evaluation in this case showed several grounds that I believe weighed heavily in favor of the juvenile court retaining jurisdiction. The evaluation demonstrated that Kimbrough was doing relatively well in school and had shown some ability to succeed in school when his attention was focused. At the time of the Collingwood incident, he was a high school freshman, liked his school, and was "proud that he [was] close to having enough credits to be placed in the 10th grade."

{¶ 131} Kimbrough did not have any noted problematic involvement with alcohol or drugs. He had a supportive family. As mentioned, he had one prior juvenile adjudication from when he was 11-years old. The adjudication stemmed from an encounter he had with his stepsister, which he disputed. The record shows

that he did "extremely well" on probation, which he completed without incident. Kimbrough had never had any placement at any Department of Youth Services ("DYS") facility.

{¶ 132} Further, Kimbrough had a speech impairment and was bullied as a youth, which led to anger issues. But Kimbrough had been in counseling and had made strides.

{¶ 133} Based on the above mentioned, the expert who completed Kimbrough's evaluation identified six bases upon which Kimbrough "would be responsive to the care and rehabilitative services available through the Juvenile Justice System." The evaluation noted:

1. [Kimbrough] had relatively minimal involvement with the Juvenile Justice System. He has one adjudication for delinquency.

2. [Kimbrough] has received only probation program services through the Juvenile Justice System. He has never been committed to or placed in a facility of [DYS].

3. [Kimbrough] did show an adequate adjustment to his probation. He was successfully terminated from his probation.

4. [Kimbrough] has had no history of significant problematic or acting out behaviors in the school setting.

5. [Kimbrough] has had no known history of the problematic use of alcohol or other drugs.

6. At the age of 16 years and 0 months, [Kimbrough] is well below the age of majority.

{¶ 134} Neither the transcript of the proceedings, nor the juvenile court's entries indicate which portions of the evaluation were considered, accepted, or

rejected. Rather, it appears that the juvenile court focused in on two factors in finding that Kimbrough was not amenable: (1) the nature of the charges, and (2) the damage done to the detention center.

{¶ 135} I am by no means downplaying the crimes that occurred here — Father Kumse was ambushed as he was collecting eggs from his chicken coop, and the detention center was significantly damaged by the youths, including Kimbrough, involved in the incident. But having said that, I think a closer examination of Kimbrough's involvement is necessary.

{¶ 136} In regard to the robbery and assault of Father Kumse, Kimbrough's actions were limited to his mere presence as the driver of the minivan. He did not leave the van while the other youths assaulted and robbed Father Kumse; he did not fire any weapons at the priest; and there was no evidence that he knew the co-delinquents were going to rob and assault Father Kumse.

{¶ 137} Further, although he was the driver of the stolen van, the evidence was scant that he knew or had cause to believe it was stolen. Likewise, as to the tampering with evidence charge, the evidence showed that Kimbrough took the gun from his cohort when they returned home and put it on a table. Another cohort took the gun from the table and placed it in a closet.

{¶ 138} In regard to the Detention Center case, the video shows that two other juveniles, not Kimbrough, were the "ringleaders" of the incident; law enforcement confirmed this as well. The incident lasted, on and off, for approximately 90 minutes, and the video shows that the staff at the center did not

enter the "pod" where the disturbance occurred. The disturbance ended when SWAT deputies from the Cuyahoga County Sheriff's Department arrived, at which time, the juveniles completely "surrendered." While the youths certainly damaged the center's property, they did not fight with each other, the staff, who, as mentioned, never entered the area, and none of the youths, including Kimbrough, left the pod area.

{¶ 139} In addition to the facts of this case and the apparent lack of consideration by the juvenile court of the factors suggesting Kimbrough would have been amenable, I am also deeply troubled by the juvenile court's lack of consideration of the wide array of dispositional options that were available to Kimbrough. At the time of the amenability hearing, Kimbrough had five years to be rehabilitated in the juvenile justice system — that, in my opinion, is a significant period of time. It is especially troubling to me in this case because Kimbrough never previously had a DYS placement and the opportunity to avail himself of those services specifically aimed at juvenile offenders. He could have received those services in the juvenile justice system and the public would have been protected at the same time.

{¶ 140} Because this was a discretionary bindover, the juvenile court was able to look at Kimbrough as a whole, and not just the crimes and his age as would be the case in a mandatory bindover. Based on what I have discussed in this dissent, I believe that

[t]he juvenile justice system should look for reform that "aims to enable juveniles to make a successful, prosocial transition to adulthood, while holding them accountable for their wrongdoing, treating them fairly, and protecting society from further offending."

Morris, 47 Cap. U.L. Rev. at 669, quoting *National Research Council, Reforming Juvenile Justice: A Developmental Approach* 89 (2013).

{¶ 141} I do not believe the juvenile court looked at Kimbrough as a whole, with his "care, protection, and mental and physical development" in mind, with the purpose of protecting the "public interest and safety," while holding him "accountable for [his] actions" and restoring and rehabilitating him. R.C. 2152.01(A). Thus, I believe the juvenile court abused its discretion in transferring Kimbrough to the adult system. I therefore dissent.